427 So.2d 403 (1982)
STATE of Louisiana
v.
Charles W. REEVES.
No. 81-KA-0909.
Supreme Court of Louisiana.
March 1, 1982.
On Rehearing January 10, 1983.
Rehearing Denied March 4, 1983.
Concurring Opinion March 21, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Leonard K. Knapp, Dist. Atty., Larry J. Regan, Eugene Bouquet, Asst. Dist. Attys., for plaintiff-appellee.
Richard Ieyoub, Lake Charles, for defendant-appellant.
DENNIS, Justice.[*]
In this case we are called upon to decide whether eavesdropping by state government *404 agents on conversations between an accused and an informant by means of a radio transmitter concealed on the informant's person with his consent violates Article 1, § 5 of the 1974 Louisiana Constitution.[1] We hold that electronic surveillance must be conducted in full compliance with the warrant requirement. A person's "communications" are specifically protected by the state constitution against unreasonable searches, seizures or "invasions of privacy." La. Const.1974, Art. 1, § 5. Consequently, antecedent justification before a magistrate is a precondition of lawful electronic interception of private communications just as it is essential to the lawful search of a house or the seizure of papers and effects. This constitutional safeguard and its warrant requirement protect each person's private communications and privacy regardless of whether his communicatee has consented to an interception or invasion.
Defendant, Charles W. Reeves, an employee of the Department of Elections was convicted of two counts of perjury. He was sentenced concurrently on each count to six months in jail and fined $1000. Defendant was found guilty on evidence showing that in testifying before a grand jury he denied having had conversations about raising compaign contributions by false expense vouchers with a fellow employee, Alvin Pilley. Defendant moved unsuccessfully before trial to suppress tape recordings and transcripts of three face-to-face conversations that state agents had intercepted without his consent through the use of a wireless transmitter they had concealed on Pilley. At trial the state was permitted, over the defendant's objection, to introduce recordings and transcripts of the intercepted communications. It is undisputed that this evidence was obtained without a warrant but with Pilley's consent and cooperation.
Defendant contends on appeal that the secret monitoring and taping of his conversations by state agents without first securing a warrant, was an unreasonable invasion of his privacy, prohibited by Article 1, § 5 of the Louisiana Constitution of 1974. The state argues that Article 1, § 5 provides no greater protection against invasions of privacy than the Fourth Amendment of the United States Constitution, as interpreted by the United States Supreme Court in United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). In White a plurality of the high court concluded that the Fourth Amendment does not require government agents to first secure a warrant before they secretly monitor private communications when one of the participants consents to the monitoring. We are called on to decide whether the affirmative right to privacy and specific protection of communications contained in Article 1, § 5 of the Louisiana Constitution of 1974, requires state agents to secure a search warrant before such electronic surveillance can be conducted.
Article 1, § 5 of the 1974 Louisiana Constitution says that:
Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
*405 By its clear terms the constitution explicitly protects every person's "communications" from unreasonable searches, seizures, and "invasions of privacy," thereby affirmatively establishing a right to privacy including a person's communications. The safeguard is unlimited and thus covers all of a person's private communications. Because the constitution expressly elevates communication as a protected interest to a position of equal stature with other expressly protected interests, invasions or interceptions of them may not be conducted without a warrant issued upon probable cause, particularly describing the communication to be invaded and the lawful purpose or reason for the interception. It is clear that the framers of the constitution sought a solution regulating but not prohibiting electronic surveillance of communications whereby the rights of individual liberty and the needs of law enforcement are fairly accommodated.
The genesis of this accommodation is recorded in the proceedings of the Bill of Rights and Elections Committee of the constitutional convention. Members of the committee urged the adoption of a safeguard more perfect than the Fourth Amendment against threats to the liberty of communications posed by technological advances in electronic wiretapping, eavesdropping and computer science.[2] An early draft of Section 5 provided: "No law shall permit the interception or inspection of any private communication or language." The committee decided to modify this outright ban, however, after realizing that it prohibited electronic surveillance even under court supervision.[3] To accommodate this perceived need, the committee altered its draft by placing communications on an equal footing with other expressly protected interests and by interposing the requirement of a warrant before any interception can be *406 conducted.[4] It is clear from the discussion and debate that the committee did not consider that the legitimate needs of law enforcement justified any exception to the warrant requirement for electronic surveillance other than, perhaps, specific exceptions similar to those which have been recognized for searches of other protected areas and interests.[5]
The final committee proposal was adopted without change by the delegates to the constitutional convention and approved by the electorate. Because Article 1, § 5 explicitly and unqualifiedly protects a person's "communications" against warrantless "invasions of privacy," we cannot believe that any reasonable delegate or voter considered that the proposed constitution excluded any form of private communication from its safeguards. These safeguards for communications and privacy are not contained in either the Fourth Amendment or the 1921 Louisiana Constitution. Clearly, the constitutional aim is to elevate them as protected interests to the same rank as houses, papers and effects and to afford them equal defense by the warrant requirement. If the intention of the framers had been otherwise, it would have been an easy matter for them to except certain types of invasions of communications from the warrant requirement, e.g., those done with the consent of a party to the communication. Moreover, we are convinced that the vast majority of law abiding Louisianians regard warrantless surreptitious electronic monitoring of their conversations, even with the consent and collaboration of their communicatees, as unreasonable invasions of their private communications.
Applying these precepts to the present case, we conclude that the state government officials' activities in electronically listening to defendant's words violated his right to privacy and right to be secure in his private communications under Article 1, § 5 of the 1974 Louisiana Constitution. Accordingly, we must reverse the defendant's conviction, order that his intercepted communications be suppressed, and remand the case for further proceedings. The testimony of the informant, Alvin Pilley, however, will not be suppressed, and the state may introduce this evidence at a new trial. As we have noted, the specific constitutional provisions banning unreasonable invasions of communications and privacy were adopted because of the threat to the liberties of innocent citizens by technological advancements in electronic surveillance and computerization. There is no indication the delegates or the electorate sought to protect a person guilty of a crime against betrayal by his confidant or considered the introduction of an informant's testimony itself an unreasonable invasion of privacy and communications.
Several other states have recently adopted constitutional provisions affirmatively guaranteeing the right to privacy or specifically protecting communications against unreasonable invasion. Alaska Const. of 1959, Art. 1, § 22, as amended in 1972 ("The right of the people to privacy is recognized and shall not be infringed ..."); Florida Const. (1968 Revision) Art. 1, § 12 (protects "against ... the unreasonable interception of private communications by any means"); Montana Const. of 1972, Art. II, § 10 ("The right of individual privacy is essential to the well being of a free society and shall *407 not be infringed without the showing of a compelling state interest."). The Supreme Court of each state has held that warrantless electronic surveillance of private communications by state officials is an unreasonable invasion of privacy even when one of the parties to the conversation consents to the surveillance.
In State v. Sarmiento, 397 So.2d 643 (Fla. 1981) the Florida Supreme Court held that, although the defendant who discussed a sale of heroin with an undercover officer in his home, assumed the risk that the officer might reveal the contents of their conversation to the outside world, the defendant enjoyed a reasonable expectation of privacy that no one else was listening to the conversation by means of electronic eavesdropping, and thus the recording of his conversation by state officers violated the Florida Constitution. The Court stated:
"We are unwilling to impose upon our citizens the risk of assuming that the uninvited ear of the state is an unseen and unknown listener to every private conversation which they have in their homes. That is too much for a proud and free people to tolerate without taking a long step down the totalitarian road." 397 So.2d at 645.
The Montana Supreme Court, in State v. Brackman, 582 P.2d 1216 (Mont.1978), held that defendant, who was charged with felony intimidation by threatening individuals in a dispute over a debt in a parking lot, was protected by the state constitution against monitoring and recording by officers without a search warrant or prior showing of a compelling state interest in defendant's conversation, and that the evidence was properly suppressed even though the threatened individuals consented to the eavesdropping. The Alaska Supreme Court, in State v. Glass, 583 P.2d 872 (Alaska 1978), held that its state charter required the suppression as evidence of a conversation between defendant and an informant in the defendant's home which was electronically recorded without a search warrant by police officers stationed outside defendant's home through the use of a transmitter worn by the informant.[6]
Article 1, § 11 of the Michigan Constitution of 1963 is very similar to the Fourth Amendment and does not affirmatively guarantee the right to privacy or specifically protect communications. However, the Michigan Supreme Court in People v. Beavers, 393 Mich. 554, 227 N.W.2d 511 (1975), held that electronic surveillance may not be conducted without a warrant even if one of the parties to the communication consents to the invasion of his privacy. The court, in interpreting its state charter recognized the "significant distinction between assuming the risk that communications directed to one party may subsequently be repeated to others and the simultaneous monitoring of a conversation by the uninvited ear of a third party functioning with one of the participants yet unknown to the other," 227 N.W.2d at 515, and suppressed the conversation between defendant and a police informant equipped with a concealed transmitter which was relayed to a police officer without defendant's knowledge and without authorization of a search warrant.
The state's attorneys argue that Louisiana merely incorporated the United States Supreme Court's interpretation of the Fourth Amendment in Article 1, § 5 of our state constitution. This contention is clearly erroneous. Our charter's affirmative establishment of a right to privacy and its explicit protection of communications as safeguards against unwarranted electronic surveillance are among the most conspicuous instances in which our citizens have chosen a higher standard of individual liberty than that afforded by the current federal jurisprudence. See State v. Abram, 353 So.2d 1019 (La.1978); State v. Hutchinson, *408 349 So.2d 1252 (La.1977); cf. State v. Overton, 337 So.2d 1201 (La.1976); Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1 (1974); Jenkins, The Declaration of Rights, 21 Loy. L.Rev. 27 (1975).
To prove this point it is hardly necessary to go beyond the words of the two constitutions. The Fourth Amendment says that
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
Justice Black pointed out that this literal language "imports tangible things, and it would require an expansion of the language used by the framers, in the interest of `privacy' or some equally vague judge made goal, to hold that it applies to the spoken word." Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Black, J., dissenting). The Louisiana Constitution, on the other hand, expressly establishes an affirmative right to privacy and treats wiretapping and bugging as "communications" within the protection against unreasonable searches, seizures, or "invasions of privacy." See Hargrave, supra, at 20-22. Evidently, the framers and the citizens were dissatisfied with the federal standard of privacy and chose to erect a special defense against potential abuses of modern electronic technology.
Moreover, while the privacy and communications of ordinary law abiding citizens were a major concern of the delegates and the electorate in adopting the 1974 Louisiana Constitution, the United States Supreme Court currently views the Fourth Amendment safeguard against electronic surveillance only in terms of the expectations and risks that "wrongdoers" or "one contemplating illegal activities ought to bear." In United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), government agents testified at trial to incriminating conversations between a government informant and the defendant which the agents, acting without a warrant, overheard by monitoring the frequency of a radio transmitter concealed on the informant. A plurality of the court, reversing the court of appeals decision, held that the defendant's Fourth Amendment rights had not been violated.[7] The plurality opinion reasoned that, since the law permits A to relay verbally to the police what is revealed to him by B (as in Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) and Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966)), or record and later divulge it (as in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963)), neither should the law protect B when A conspires with governmental agents to betray B by contemporaneously transmitting to the other all that is said. 401 U.S. at 751, 91 S.Ct. at 1125-26, 28 L.Ed.2d at 458; 401 U.S. at 785, 91 S.Ct. at 1142, 28 L.Ed.2d at 478 (Harlan, J., dissenting). The plurality opinion is not concerned with protection of the ordinary citizen, who has never engaged in illegal conduct in his life, to assure "that he may carry on his private discourse freely, openly and spontaneously without measuring his every word against the connotations it might carry when instantaneously heard by others unknown to him and unfamiliar with his situation or analyzed in a cold, formal record played days, months, years after the conversation." 401 U.S. at 790, 91 S.Ct. at 1145, 28 L.Ed.2d at 480 (Harlan, J., dissenting). The failure to address this concern or to explain why an ordinary citizen does not have a reasonable expectation of privacy from wiretapping or bugging even with the collaboration of his communicatees has been the subject of incisive scholarly criticism. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349 (1974); Comment, Electronic Eavesdropping and the Right to Privacy, 52 B.U.L.Rev. 831 *409 (1972). Cf. Greenwalt, The Consent Problem in Wiretapping and Eavesdropping: Surreptitious Monitoring With the Consent of a Participant in the Conversation, 68 Colum.L.Rev. 189 (1968).
We, of course, give careful consideration to the United States Supreme Court interpretations of relevant provisions of the federal constitution, although we are not bound by them in construing the Louisiana Constitution. The White rationale is entirely inappropriate, however, as a guide for the interpretation of our specific safeguard against invasion of communications and our affirmative right to privacy. The Fourth Amendment does not contain these explicit guarantees and, as interpreted by the White plurality, simply does not address some of the types of invasions of privacy that concerned the delegates and the people of this state in adopting the 1974 Louisiana Constitution. Indeed, it seems likely that Louisiana decided to establish greater safeguards in its 1974 constitution partly because the course of the United States Supreme Court decisions in White and other cases had been "outflanked by the technological advances of the very recent past." Lopez v. United States, 373 U.S. 427, 465-466, 83 S.Ct. 1381, 1401-1402, 10 L.Ed.2d 462, 486 (1963) (Brennan, J., dissenting).
The legislative history and absolute wording of the Louisiana Constitution indicate that the delegates recognized the qualitative difference between the known risk we all take that a false friend might betray our trust by revealing the contents of our conversation to others and the unknown risk that the uninvited ear of the state is an unseen and unknown listener to our private conversations. A party speaking in private conversation does not knowingly expose his conversation to the public simply because an unknown party is surreptitiously hearing and recording every word that is being spoken. A confidence repeated by a false friend is received by others with attendant circumstances of the friend's credibility and memory. Without the use of electronic surveillance, one's remarks are not preserved for posterity on the reels of magnetic tape. As soon as electronic surveillance comes into play, the risk changes crucially and clearly there is an invasion of privacy. While there is no indication that the delegates sought to protect a person against betrayal by his confidant, clearly they sought to eliminate the danger that an official record is being made of what we say to unknown government agents at their unfettered discretion. See State v. Sarmiento, supra; State v. Glass, supra; State v. Brackman, supra; United States v. White, supra (Harlan, J., dissenting); Lopez v. United States, supra (Brennan, J., dissenting); Holmes v. Burr, 486 F.2d 55 at 72 (9th Cir.1973) (Hufstedler, J., dissenting); Amsterdam, supra; Comment, 52 B U.L.Rev. at 842-843.
It is evident from the wording of Article 1, § 5 that it mattered little to the delegates that consensual surveillance is arguably less obnoxious than wholly clandestine surveillance. If the delegates had wished to establish a lesser safeguard, or draw nice distinctions between types of electronic surveillance, they would have adopted a more general provision, identical or more similar to the Fourth Amendment. Indeed, a respectable school of thought holds the view that the Fourth Amendment itself prohibits both methods of electronic surveillance in the absence of judicial supervision. See United States v. White, supra (Harlan, J., dissenting); Lopez v. United States, supra (Brennan, J., dissenting); Hufstedler, Invisible Searches for Intangible Things: Regulation of Governmental Information Gathering, 127 U.Penn.L.Rev. (1979); Parker, A Definition of Privacy, 27 Rut.L.Rev. 275 (1974); Amsterdam, supra; Comment, 51 B.U.L.Rev., supra; Greenwalt, supra.
Our constitution does not condemn the use of participant monitoring by law enforcement personnel. When circumstances justify electronic surveillance, however, the resulting invasion of privacy and communications must be conducted in full compliance with the warrant requirement in order for evidence gained thereby to be admitted *410 at trial.[8] To protect the right of privacy (not for the defendant whose privacy has already been invaded, but for law abiding citizens in the state) is and should be of primary importance to the courts. State v. Melson, 284 So.2d 873, 875 (La.1973). The warrant requirement does not unreasonably impinge on legitimate law enforcement efforts. In all of the cases we have examined, none revealed circumstances so exigent that law enforcement personnel would not have had time to obtain a warrant. In the present case, the informant reported to the FBI in June, 1979 that the defendant was attempting to coerce false expense vouchers and campaign contributions from him. The state attorney general began an investigation of the matter on October 4, 1979 and obtained the informant's consent to participant electronic surveillance on October 15, 1979. The defendant's communications were intercepted on October 17, October 26 and November 23, 1979. If there was probable cause to believe these communications would constitute crimes or contain evidence thereof, a warrant could have been secured. Furthermore, the failure to obtain a warrant does not prevent the informant from testifying to what he heard and observed in his conversations with the defendant. See State v. Sarmiento, supra; State v. Glass, supra; State v. Brackman, supra; People v. Beavers, supra.
For the reasons assigned, the defendant's convictions and sentences are reversed, the contents of the electronic interceptions of the defendant's communications are suppressed, and the case is remanded for a new trial or other proceedings consistent with this opinion.
REVERSED AND REMANDED.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting.
Although the issue was not extensively urged in State v. Hennigan, 404 So.2d 222 (La.,1981), this court considered the contention that electronic recording of conversations was a violation of defendant's rights under the Louisiana Constitution. Relying on State v. Petta, 359 So.2d 143 (La.,1978), Hennigan held that the taped recordings of defendants' conversations with a government witness, who consented to the recordation, did not violate either the United States Constitution or the Louisiana Constitution.
It would be indeed anomalous if a recorded conversation which constituted a crime could not be recorded without a warrant while a government witness could testify as to any other conduct which constitutes a crime.
Therefore, I respectfully dissent.

ON REHEARING
BLANCHE, Justice.
On our initial review of this case, we held that the warrantless monitoring of a conversation through the use of an electronic transmitter concealed on the person of one of the parties to the communication violates Article 1, § 5 of our 1974 Louisiana Constitution. After careful consideration on rehearing, we must reverse our original finding, and in so doing, we affirm the conviction and sentence imposed upon the defendant by the trial court. The use of electronic surveillance equipment, which is hidden from view on the person of a consenting party to a conversation, does not "invade the privacy" of the other party or parties in the conversation within the meaning of our Constitution, and, therefore, the warrant requirement does not attach.
In this opinion we will discuss the defendant's assignment of error number 1. None of the remaining assignments of error present reversible error, and they involve legal issues which are governed by clearly established principles of law. Therefore, they will be treated in an unpublished appendix which will comprise part of the record in this case.
*411 During the fall of 1979, the State Attorney General's office received information from the F.B.I. concerning complaints filed by Alvin Pilley, an employee of the Department of Elections and Registration. An investigation ensued, and a meeting was arranged with Pilley on October 4, 1979. At this meeting, investigators for the Attorney General's Office were informed by Pilley that he was being pressured by his supervisors to contribute money to the campaign of Commissioner Jerry Fowler. In addition, Pilley exposed a procedure approved by certain employees of the Department of Elections whereby he could receive reimbursement for any contributions he made to the campaign fund by filing false state travel expense vouchers.
Arrangements were made by the Attorney General's Office to provide Pilley with $100.00 to contribute to the campaign. With Pilley's consent, the investigators concealed an electronic transmitter on his person in order to overhear and record his conversations with other employees of the Department of Elections concerning the falsification of the travel vouchers as a means to reimburse Pilley for his $100.00 contribution. On several different occasions during the months of October and November of 1979, Pilley wore the electronic transmitter into the voting machine warehouse in Lake Charles. Investigators were posted outside in two cars. One of these cars was equipped with machines to receive and tape record the transmissions. The other automobile contained a repeater system which allowed the agent seated in the car to hear Pilley's conversations.
Once inside the warehouse, Pilley engaged in conversations with several Department of Elections employees. Among them was the defendant, Charles Reeves, who was the voting machine transportation and storage inspector and also Pilley's supervisor. During his recorded colloquy with Pilley, the defendant made several statements concerning the false travel vouchers.
On November 26, 1979, the defendant was requested to appear before a grand jury which had been formed to investigate allegations of illegal political activity, theft, and falsification of official travel vouchers by employees of the Louisiana Department of Elections and Registration. Reeves' testimony before the grand jury resulted in a three count indictment against him for perjury. After a jury trial, the defendant was found guilty of two of the three perjury counts. He was sentenced on one count to pay a fine of $1,000 and serve six months in the parish jail. On the other count, the defendant was sentenced to six months in the parish jail. These sentences were ordered by the judge to be served concurrently.
By his assignment of error number 1, the defendant asserts that the trial court erred in denying his motion to suppress the tape recordings of the conversations in which he participated while inside the voting machine warehouse. Our original opinion reversed the defendant's conviction and sentence on this issue. We interpreted the language of our 1974 Constitution Article 1, § 5, which protects a person's "communications" against unreasonable "invasions of privacy", to proscribe the admission of evidence secured through electronic surveillance of any type when such surveillance was conducted without compliance with the warrant requirement. However, we failed to analyze properly this constitutional protection. Although the defendant's conversations were surely "communications" within the meaning of Article 1, § 5, the manner in which the conversations were monitored, by consensual electronic surveillance, did not "invade the privacy" of Charles Reeves.
In many respects, Article 1, § 5 of the 1974 Constitution is similar to the Fourth Amendment of the United States Constitution.[1] Each is concerned with the protection *412 of people and their privacy against unreasonable governmental intrusion. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Abram, 353 So.2d 1019 (La.1977), cert. denied, 441 U.S. 934, 99 S.Ct. 2058, 60 L.Ed.2d 663 (1979); State v. Fearn, 345 So.2d 468 (La. 1977). There are, however, obvious differences in terminology. Unlike the U.S. Constitution, our provision explicitly protects every person's "communications" from "unreasonable invasions of privacy."
The present case necessitates the interpretation of "communications" and "invasions of privacy," those terms in Article 1, § 5 of the 1974 Louisiana Constitution which are not found in the Fourth Amendment. Our inquiry is two-fold (1) Whether the defendant's conversations were "communications" within the meaning of Article 1, § 5 and (2) Whether the manner in which the conversations were intercepted constituted an "invasion of privacy."[2] Prior Louisiana jurisprudence provides us with little guidance in this formidable task. Therefore, an analysis of the transcripts of the Louisiana Constitutional convention and an examination of other sources of reference are essential to our understanding of Article 1, § 5.
Without question, the members of the Committee on Bill of Rights and Elections, who drafted Article 1, § 5 of the 1974 Louisiana Constitution, were aware of the potential threat to privacy posed by governmental electronic surveillance. The original proposal for Article 1, § 5, which was tentatively adopted by the Committee on April 17, 1973, would have prohibited all forms of electronic surveillance, with or without a warrant.[3] Delegate Jenkins, the author of this draft, argued that such a ban was necessary to protect the communications of innocent persons from governmental electronic intrusion.[4]
On May 19, 1973, however, the initial draft was revised. On that date, Professor Benjamin Shieber addressed the Committee on certain aspects of the proposed Bill of Rights. Shieber severely criticized the Committee's decision to ban electronic surveillance. He contended that a provision of this sort had no place in the Louisiana Constitution and would prove to be devastating to law enforcement officials in their efforts to combat organized crime. If the Committee's goal was to protect communications from electronic surveillance, Sheiber suggested that the members should adopt a *413 search and seizure article with language similar to the Fourth Amendment. After all, the United States Supreme Court had interpreted the Fourth Amendment to protect communications from unreasonable searches and seizures.[5] The Committee agreed with Sheiber's assessment and eliminated the ban on electronic surveillance. However, the word "communications" was inserted in the list of persons, property, houses, papers, and effects in Article 1, § 5. In this way, the members of the Committee insured and made it explicit that each person's communications would be free from unreasonable searches, seizures, or invasions of privacy.
Therefore, the transcripts of the Louisiana constitutional convention do provide us with the answer to our first inquiry. Clearly, the Framers intended the defendant's intercepted conversations to be "communications" and protected by Article 1, § 5 from invasions of privacy.
Unfortunately, the transcripts do not reveal the intention of the delegates as to the second and more difficult questionwhether consensual electronic surveillance is an "invasion of privacy." We find that both the provision protecting against "invasions of privacy" and the absolute ban on electronic surveillance appeared in the original draft of Article 1, § 5 of the 1974 Louisiana Constitution. Initially, members of the Committee on Bill of Rights and Elections did not consider the phrase "invasions of privacy" in connection with electronic surveillance. There was no need. All forms of electronic surveillance were proscribed in Mr. Jenkins' original proposal. "Invasions of privacy" were discussed only in the context of the procurement of blood samples for DWI arrests.[6] Even after the Committee decided to eliminate the ban on electronic surveillance, discussions on the "invasions of privacy" provision focused primarily on its effects on the seizure of documents held by fiduciaries.[7]
We do observe that the protection against "invasions of privacy" was debated in relation to electronic surveillance on one occasion.[8] During the Committee's June 14, 1973 meeting, the members expressed their approval of Article 1, § 5 and the affirmative guarantee provided to each person's "communications" against "invasions of privacy." However, the Committee wisely *414 avoided a determination of which forms of electronic surveillance were "invasions of privacy" and subject to the warrant requirement. Instead, they chose to write the constitutional provision to allow for judicial interpretation.[9] As a result, Article 1, § 5 was rendered more flexible; it would be more responsive to future technological advances in the area of electronic surveillance.
Our concern in this case, therefore, is whether consensual electronic surveillance is an "invasion of privacy." At the outset, we note that privacy is an elusive term, for it encompasses a multitude of different interests. The fact that scholars disagree on the meaning of privacy in relation to searches and seizures is not surprising. Judge Cooley defined privacy simply as the "right to be let alone." [10] Other writers with more expansive ideas on the subject have described the concept of privacy as "the right to share and to communicate."[11] One recent comment has viewed privacy as the "individual's interest in determining for himself when, how, and to what extent information about him is revealed to others."[12]
We refrain from the temptation to engage in the almost impossible task of pronouncing an all-embracing definition of privacy or an "invasion of privacy." Rather, we limit our discussion to electronic surveillance, or more specifically, consensual electronic surveillance, and its effect upon the interests sought to be protected by the phrase "invasions of privacy" in Louisiana Constitution Article 1, § 5.
Our jurisprudence sheds little light upon the meaning of privacy and its relationship to electronic surveillance. In State v. Petta, 359 So.2d 143 (La.1978), we followed the reasoning of United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) and approved the warrantless interception of two telephone conversations when consent of one of the parties had been obtained. However, we examined State v. Petta, 359 So.2d 143 (La.1978) only in terms of the Fourth Amendment. A subsequent decision, State v. Hennigan, 404 So.2d 222 (La.1981), did hold that consensual electronic surveillance violated neither the Louisiana Constitution nor the United States Constitution. In that case, the defendant failed to extensively argue that his Louisiana constitutional *415 rights had been infringed. Therefore, we had no opportunity to scrutinize Louisiana Constitution Article 1, § 5 in relation to consensual electronic surveillance.
The United States Supreme Court, on the other hand, has examined intensively the effect of electronic surveillance upon one's privacy in construing the Fourth Amendment. In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court was confronted with the problem of the Government's employment of nonconsensual electronic surveillance without a warrant. Federal agents had attached an electronic listening device to the outside of a public telephone booth to overhear and record the defendant's telephone conversations inside the booth. At trial, the judge permitted the Government to introduce the recordings into evidence. The Supreme Court of the United States reversed and held that the recordings were inadmissible in evidence absent a warrant, for the Government's activities in electronically listening to and recording the defendant's words violated the privacy upon which he justifiably relied while using the telephone booth.
The United States Supreme Court arrived at a different conclusion when consensual as opposed to nonconsensual electronic surveillance was employed by the Government to secure evidence. In United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), the Court held that consensual electronic surveillance was not subject to the warrant requirement, for it did not invade the constitutionally "justifiable" expectations of privacy of the defendant.
The facts in White are very similar to our present case. A government informer concealed a radio transmitter on his person and engaged in conversations with the defendant. By monitoring the frequency of the transmitter carried by the informant, government agents were able to overhear certain incriminating statements by the defendant. No warrant had been obtained. During the defendant's trial, the court overruled defense objections to the testimony of the agents who had conducted the electronic surveillance. The United States Supreme Court upheld the trial court's ruling. Justice White, in speaking for the Court, observed that each person who enters into a conversation assumes certain risks which are not protected by the Fourth Amendment. One such risk, as stated in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), is that his listener may be a police agent who may report their conversation to the authorities immediately following their encounter. In those circumstances, the Fourth Amendment is not violated, for the person's constitutionally "justifiable" expectations of privacy are not invaded. The declarant, by entering into the conversation, had accepted the risk that his listeners may disclose his confidences. Justice White found that no different result was required where a police officer or agent, who conceals his identity and is a party to the conversation, wears an electronic device:
Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. Hoffa v. United States, 385 U.S., at 300-303, [87 S.Ct., at 412-414] 17 L.Ed.2d at 381, 382. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, Lopez v. United States, supra [373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462]; (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. On Lee v. United States, supra [343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270]. If the conduct and relevations of an agent operating without electronic equipment do not invade the defendant's constitutionally *416 justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.[13]
We agree with United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), that consensual electronic surveillance involves different privacy considerations than non-consensual electronic surveillance. Moreover, we believe that the "invasion of privacy" provision in Article 1, § 5 of the 1975 Louisiana Constitution does not prohibit warrantless consensual surveillance. However, we choose not to adopt the analysis of the Supreme Court in White. Rather, we prefer to follow our previous decisions and examine the effect of the constitutional guarantee against "invasions of privacy" on consensual electronic surveillance in light of the test articulated by Justice Harlan in Katz. See State v. Williams, 375 So.2d 364 (La.1979); State v. Lamartiniere, 362 So.2d 526 (La.1978). Harlan's approach for measuring a person's expectation of privacy is as follows:
"... My understanding of the rule that has emerged from prior decisions is that there is a two-fold requirement; first, that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as `reasonable'..." 389 U.S. at 361, 88 S.Ct. at 516.
We find that the defendant Reeves, a victim of consensual electronic surveillance, did not exhibit a subjective expectation of privacy. No other conclusion is possible when we examine the defendant's privacy interests in the statements made to Pilley in the three following hypothetical situations: (1) Pilley does not contact the police before the conversation takes place (i.e. he is not a police agent), but he voluntarily reports the defendant to the authorities immediately after the termination of the communication. At this time, Pilley repeats the conversation to the police. (2) Pilley is a police agent, but he wears no electronic devices. (3) Pilley is a police agent, and he conceals an electronic transmitting device on his person.
Clearly, in the first situation, the defendant has no subjective expectation of privacy. Reeves, by entering into the conversation, should realize that Pilley, or any other party to the communication, may violate his confidence and disclose to others, including the police, the incriminating remarks made therein. Though the violation of a confidence is rarely contemplated by the declarant, his knowledge of the risk (disclosure) is ever present and destroys his subjective expectation that the communication will forever remain a secret (private). Accordingly, unless there is honor among thieves, disclosure to another by one who possesses knowledge of the other's misdeeds is a fact of life that precludes the subjective expectation of privacy.
*417 Similarly, Reeves possesses no subjective expectation of privacy in the second situation. What difference would it make that he did not know to whom he was speaking and that his "friend" to whom he was making these disclosures of illegal activity was in fact a police officer or police informer? The fact remains that the risk that his confidence will be violated and that his disclosures may be repeated to others is the same regardless whether made to a false friend or police informer. That risk was stated as a fact of life in Lopez v. United States, 373 U.S. 427, 465, 83 S.Ct. 1381, 1402, 10 L.Ed.2d 462 (1963):
"... The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals, is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak (Brennan, dissenting) ..."
This court, in State v. Moses, 367 So.2d 800 (La.1979), cited this passage from Lopez with approval in interpreting Article 1, § 5 of our 1974 Louisiana Constitution.[14]
The third situation is our present case. As in the second hypothetical, Reeves expects and accepts the risk that Pilley is a possible police agent. Pilley's presence as an informant, therefore, does not invade the subjective expectations of privacy of the defendant.
One aspect of Reeves' encounter with Pilley has been altered by this third situation, however. Hidden from view on Pilley's person is an electronic transmitter. In our original opinion, we found that the presence of the transmitter dramatically changes the effect on the privacy interests of the defendant who engages in the conversation:
"... A party speaking in private conversation does not knowingly expose his conversation to the public simply because an unknown party is surreptitiously hearing and recording every word that is being spoken. A confidence repeated by a false friend is received by others with attendant circumstances of the friend's credibility and memory. Without the use of electronic surveillance, one's remarks are not preserved for posterity on the reels of magnetic tape. As soon as electronic surveillance comes into play, the risk changes crucially and clearly there is an invasion of privacy. While there is no indication that the delegates sought to protect a person against betrayal by his confidant, clearly they sought to eliminate the danger that an official record is being made of what we say to unknown government agents at their unfettered discretion..."
Thus, our first review of this case hinged the invasion of the defendant's privacy on the fact that the electronic equipment recorded his conversation word-for-word. We failed to realize, however, that the risk of disclosure includes the manner of disclosure. As illustrated by our previous hypotheticals, the defendant enters into the conversation knowing that his confidences may be disclosed to anyone by the listener. He also must realize that this disclosure could take any form. To decide otherwise would force this court to speculate as to which form of disclosure a person risks and which one he does not anticipate when entering into a conversation. Such theoretical line drawing is result oriented. For example, how can we conclude that a declarant foresees and risks that his listener is a police agent who will testify in court against him, and then rationally decide that the same speaker cannot anticipate and risk that the listener will tape his conversation and play it in court as in this present case? We cannot. The risk that his confidence will be violated and his disclosures may be repeated to others is the same. He assumes this risk upon entering the conversation. Therefore, we find that the defendant exhibited no actual expectation of privacy.
If we assume, arguendo, that the defendant did exhibit a subjective expectation of privacy, is this the type of expectation *418 which society at large would recognize as reasonable? We think not. Society seeks to foster truth, not to suppress it. The presence of the electronic transmitter has but one effect. Instead of the informant committing the conversation to memory, a machine tapes each and every sentence of the communication. The machine notes the inflection of the voices and the context in which remarks are made. If the defendant speaks innocently, his own words will exculpate him. However, if he implicates himself, the recordings prevent him from denying his participation in the conversation. Surely, society would not consider reasonable an expectation of privacy which would result in a more inaccurate version of the events in question.
Those who oppose warrantless consensual surveillance argue that it will have a chilling effect on free and open discourse among members of society. This claim is speculative at best. In order for members of society to feel inhibited, they must be aware of the use of consensual surveillance without a warrant and have a corresponding fear of it.[15] Yet, federal agents have always been allowed to monitor the conversations of a party without a warrant when consent of one of the parties to the communication had been obtained. United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). Until our initial decision in this case, Louisiana also permitted warrantless consensual surveillance. State v. Hennigan, 404 So.2d 222 (La.1981); In re Haggerty, 257 La. 1, 241 So.2d 469 (1970). The fact that this type of surveillance exists in the federal system or existed in our jurisdiction has not frustrated society's willingness to trust others. Free and open discourse has not been inhibited.[16]
Although the defendant's conversations were "communications", we hold that the manner in which these communications were intercepted, through warrantless consensual electronic surveillance, did not invade his privacy within the meaning of La. Const. art. 1, § 5. Therefore, the trial court's denial of the defendant's motion to suppress the tape recordings was proper.
This assignment has no merit.

DECREE
For the foregoing reasons, the defendant Reeves' conviction and sentence are affirmed.
LEMMON, J., subcribes to the opinion and assigns additional reasons.
DIXON., C.J., and DENNIS, J., dissent with reasons.
CALOGERO, J., dissents believing that the opinion on original hearing was eminently correct.
LEMMON, Justice, concurring.
La. Const. Art. I, § 5 (1974) places unreasonable seizures of communications and invasions of privacy in the same category as unreasonable seizures of property and effects. Thus, the requirements of probable cause and a warrant are generally applicable before government authorities can intercept a communication, unless some justifiable exception to these requirements makes a warrantless seizure reasonable.
A governmental intrusion into a citizen's privacy for traditional police activity, without probable cause or a warrant, is usually reasonable if based on consent. Any person with mutual access can grant valid consent. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Thus, when two people jointly occupy a house, either can give consent to search the premises; similarly, when two people engage in a conversation, either can reveal the contents of the conversation or give consent to intercept the communication.
*419 Valid consent of one of the parties is therefore the primary basis of my conclusion that the warrantless seizure of the communication was reasonable in this case. However, because of the importance of this decision, I also add the following concurring thoughts.
After reviewing the convention records of the genesis of the Louisiana constitutional provision protecting "communications" against "unreasonable ... invasion of privacy", I cannot conclude that either the convention debates or the plain wording of Section 5 clearly controls our resolution of the issue presented in this case. Although the Constitution expressly protects "communications" against "unreasonable invasions of privacy", the real issue is whether the presence of the surreptitiously invited electronic "third ear" (whose presence and infallible capacity to retain and later repeat the spoken words is unknown to the speaker, but not to the listener) is an unreasonable invasion of the speaker's privacy, without the establishment of probable cause and prior judicial approval of its presence.
The majority opinion concludes that this defendant assumed the risk not only that Pilley might later repeat defendant's words, but also that he (or others with his consent) might be contemporaneously listening to and recording those words. If there was no unreasonable invasion of the speaker's privacy by a listener who later gave testimonial proof of the conversation as evidence of defendant's guilt, then electronic recording of the conversation as corroboration of that testimony should not be considered an unreasonable invasion of the speaker's privacy.
This objective determination of reasonableness is a recognition that society should not necessarily protect the subjective expectations of the speaker. Nevertheless, the specter of the "Orwellian Big Brother", so vividly portrayed in Justice Harlan's dissenting opinion in United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), is and should be of grave concern to the courts, as well as to legislative bodies. However, the Legislature (despite the general awareness of the advances in technology available for "electronic surveillance") enacted in 1980 an "Electronic Surveillance" statute (R.S. 15:1301 et seq.), which (like its federal predecessor and counterpart) explicitly exempted from its scope police electronic interception of a conversation when one of the parties consents. See R.S. 15:1303 B(3). Compare 18 U.S.C. § 2511(2)(c). The fact that the members of the legislative branch approved such procedures only six years after the adoption of the Constitution certainly indicates that those elected representatives of the people did not believe such action to be an unreasonable invasion of the privacy of a person's communications.[1] In enacting Act 241 of 1980, the Legislature must have construed the Louisiana constitutional protection as intended to be coextensive with the United States Supreme Court's assessment of Fourth Amendment protections clearly expressed in Katz and White, rather than as intended to be a rejection of White.[2]
Thus, while the scholarly argument of the original opinion is very persuasive, I cannot subscribe to the view that Section 5 expressly repudiated the White "risk" rationale. Indeed, had the convention delegates intended to "overrule" White in Section 5, I believe that the debates (and the academic commentary immediately following the Constitution's adoption) would have plainly revealed such a dramatic result.
If the fears expressed by the dissenters later materialize, the Legislature may be persuaded to adopt the added protections of probable cause or judicial supervision to govern the present situation and to provide the law-abiding citizens with greater protection from "electronic surveillance" than *420 is required by the state and federal constitutions. The legislators (more so than this court) reflect the views of the people whom they represent, and they can act to curb specific abuses and to prevent state law enforcement agents from engaging in activities which are not reasonably related to legitimate law enforcement functions.
Moreover, this decision merely holds that probable cause and a warrant are not absolute requirements for interception of communications. Whether there was an "unreasonable... invasion of privacy" must be determined in each case.[3] This decision should not be construed as an invitation for law enforcement agents to engage in the sorts of abuses with which the dissents (both here and in White) are concerned. Nothing in the holding of this case prevents the courts from affording adequate protection to a citizen's constitutionally protected interest in being free of unreasonable invasions of the privacy of his communications.
DIXON, Chief Justice (dissenting)
With all due respect, I dissent.
The Louisiana Constitutional Convention, by literally including protection for communications and against the invasion of privacy, certainly intended to strengthen those rights so valuable to free people. No sensible argument can be made to the contrary. This opinion weakens those protections.
The only serious relevant argument in the Committee on Bill of Rights and Elections about protecting private communications was whether to prohibit absolutely all invasions of private communications, or to permit such invasions upon warrant supported by probable cause.[1]
*421 This conclusion should be evident even without the advantage of the transcripts of the Convention. The protection of private communications is placed with unreasonable searches and seizures, the protection against which (with carefully fashioned exceptions) is the warrant requirement, supported by probable cause.
If the majority really thinks there is an important freedom interest in preventing wholesale police intrusion into private communications, it should simply apply the same rule that this state and the federal government do before permitting a policeman (the "consenting" party) to search a homehe must obtain a warrant from a magistrate, based on probable cause. The reluctance of the police to comply with this simple rule, and the ease with which the majority accommodates them, demonstrates that, in balancing the juridical values at play in this rather simple task of statutory interpretation, it is more important (to them) to permit police to monitor our communications than to require, simply, that they obtain a warrant before eavesdropping.
The majority says it has faced a "formidable task." It is not "formidable" to decide the plain meaning of simple words. It only becomes "formidable" when one is willing to be so loose with language that he can call an invasion of privacy "consensual" when the one whose privacy is involved has not consented to the broadcast of his conversation to the police or other interested persons. Such a corruption of the language is indefensible.
We should require, as our constitutional provision does, that the police obtain a warrant to institute electronic eavesdropping.
DENNIS, Justice, dissenting.
With all due respect for my brethren in the majority,[*] I am shocked by the methodology and the results of their opinion.
There is no gentle way to say it without belittling the wrong and the harm done. The combination of serious errors in the majority opinion results in nothing less than a subversion of the will of the people of the State of Louisiana as expressed in their constitution and amounts to a judicial undermining of rights that the people in their constitution declared shall be "inalienable by the state and shall be preserved inviolate by the state." La. Const.1974, Art. 1 § 1.
Essentially, the majority has committed serious error and irreparable damage by: (1) Permitting searches and seizures of "communications" to be conducted outside the judicial process, without prior approval by a judge or magistrate, despite the clear wording of the constitution which expressly protects a person's "communications" in the same way it protects his home by forbidding government intrusion except upon warrants based on probable cause supported by oath or affirmation, with particular description of the limits of the intrusion and a statement of the lawful purpose or reason for the intrusion, La. Const.1974, art. 1, § 5; (2) Allowing electronic interception of "communications" without probable cause to believe or suspect that they will contain evidence of a crime, contrary to the constitution's explicit prohibition; (3) Failing to recognize that our constitution, by expressly providing that every person shall be secure in his "communications," necessarily protects a person's communications when he *422 speaks to another, and repudiates the idea that once a person speaks to another there is no longer any protection of or constitutionally secured interest in his communication; (4) Arrogating to itself the illegitimate power to write constitutional rules governing searches, seizures and invasions of every person's "communications" on the flimsy ground, for which there is no evidence, that the delegates and the people intended to delegate such power to the courts in their constitution; (5) Failing to recognize that the protections of art. 1 § 5 go further than the protection of privacy, that they also protect against unreasonable searches and seizures, and often have nothing to do with privacy at all; thus the majority totally overlooked that recording a person's communications without his consent or a warrant based on probable cause is an unreasonable search and seizure of his communications which is expressly prohibited by the state constitution, regardless of whether it invades his privacy; (6) Destroying all civil actions for invasions of privacy based on electronic bugging, or publication of such recordings, regardless of whether the surveillance was conducted for a lawful purpose; the majority has held that once a person speaks to another he loses all of his privacy interest in the communication, regardless of whether there was a warrant, probable cause or a lawful purpose for the intrusion; (7) Failure to consider the implications on a case such as this by the Electronic Surveillance Act, La.R.S. 15:1301 et seq., by which the legislature has recently prohibited the interception or acquisition of the contents of oral communications through electronic devices except upon authorization by a judge issued upon a showing supported by written application under oath of probable cause to believe that communications concerning certain violations of the controlled dangerous substances act will be obtained thereby. Apparently, the legislature has restricted electronic interception of oral communications to those based on warrants involving serious drug offenses.
The evils which result from the majority opinion are obvious: (1) Any employee of the state or a political subdivision thereof, including game wardens, revenue agents, justices of the peace, and constables, may record the communications of any person without his knowledge or consent, upon compliance of his addressee, regardless of whether the agent has obtained a warrant, and regardless of whether the agent had probable cause or a lawful purpose for the intrusion; (2) If a government agent initiates such electronic surveillance against an innocent person for an unlawful reason, such as for his own personal, political or business purposes, the person has no remedy in law for the interception, acquisition or publication of his communication because this court has held that his constitutionally guaranteed security in his communication ceases once he communicates it to another, that is, at the moment it becomes a communication. Thus, an innocent person has no civil action for invasion of privacy based on such wrongful electronic surveillance or the resulting publication of his private thoughts and he cannot suppress or exclude such recordings as evidence in a criminal prosecution; and (3) Under the majority's theory that regulation of a person's security in his communications is vested solely within the prerogative of the judiciary, a future majority of this court could decide to withdraw all state constitutional protection of private communications whatsoever, and all civil or criminal remedies based thereon, or, on the other hand, it might decide to prohibit absolutely any interceptions of any communication, as was originally proposed in the constitutional convention committee.
The original opinion of this court held that a government agent may not electronically seize, intercept or acquire the oral communications of a person without his knowledge or consent except on warrant issued by a judge or magistrate based on oath or affirmation showing probable cause for the intrusion. That decision was based on:
A. The constitution's express statements that every person shall be secure in his communications against unreasonable searches, seizures or invasions of privacy and that no warrant *423 shall issue without probable cause supported by oath or affirmation, particularly describing the limits of the search and the lawful reason or purpose of the intrusion. La. Const. 1974, art. 1 § 5.
B. The express protection by the constitution of every person's "communications" as an element of his personal security of equal rank and importance with and included among his "person, property ... houses, papers and effects." Id.

C. The universal interpretation of provisions similar to article 1 § 5 and the Fourth Amendment, until today, has been that government intrusion upon any of the elements of personal security specifically listed therein by a search or seizure conducted outside of the judicial process, without prior approval by a judge or magistrate, is prohibited as unreasonable per se. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Malone, 403 So.2d 1234 (La. 1981); State v. Matthews, 366 So.2d 1348 (La.1978); Cf. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).
D. The Louisiana constitution's repudiation of the federal standard in that: (i) Art. 1 § 5 specifically states that every person shall be secure in his "communications" thus affording protection to the entire completed act or instance in which a verbal or written message is transmitted to another, whereas the federal safeguard ceases during or at the commencement of the act of communication, i.e., when one man speaks to another and incurs the risk of publication of his remarks. United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); (ii) Art. 1 § 5 does not simply duplicate the Fourth Amendment but goes beyond it to guarantee that all "communications" shall be protected; moreover, it was adopted after the United States Supreme Court had held that the federal safeguard which does not specifically protect communications did not secure all communications.
E. The uncontradicted convention history and proceedings which indicate: (i) The delegates wished to reject Washington's pre-Watergate notions of acceptable electronic bugging; (ii) The committee originally drafted an article which would have prohibited all electronic surveillance by government; (iii) The committee became concerned that this would unduly hamper law enforcement, but they rejected Professor Shieber's recommendation of a simple duplication of the Fourth Amendment; (iv) The final committee proposal was a compromise between an absolute ban of government electronic surveillance and the federal assumption of risk and reasonable expectation approaches. All communications of a person are protected against warrantless searches, seizures and invasions, just as his person, houses, property, papers or effects; (v) Nothing in the debates indicates an intention to exclude any type of transmission of information between persons from the "communications" safeguard or to exclude from the warrant requirement any seizure, interception, or appropriation of a person's communication; (vi) The committee proposal was adopted without change by the convention and the people. There is nothing in Article 1 § 5 that indicates it should be given anything other than an ordinary common sense interpretation. Therefore, it protects all communications by the warrant requirement, and thereby prohibits as unreasonable all searches, seizures and invasions not authorized in advance by a magistrate or judge on probable cause supported by oath, particularly describing the limits of the intrusion and its lawful purpose.
The present majority opinion makes no attempt to refute the reasoning of the original *424 opinion of this court. Instead, it contents itself with the following argument:
A. Because no delegate said during committee debate that any type of electronic interception of communications would be excluded from the warrant requirement, this meant that the delegates and the people intended to subject the whole question of security of communications to the rulemaking power of this court.
B. This court does not choose to follow the traditional rationale that any search or seizure conducted outside the judicial process, without prior approval by judge or magistrate, is per se unreasonable, in determining whether a seizure or an interception of a communication is unreasonable. (But the majority does not say why.)
C. (By oversight or design, the majority does not discuss or explain why the seizure or interception of a communication without probable cause is not unreasonable, even if a warrant is not required. Apparently, however, the majority has decided that seizures and interceptions conducted on mere suspicion or for no reason at all are permissible as long as the addressee collaborates in the bugging.)
D. A government agent's recording of a person's communications without his knowledge or consent is not an unreasonable invasion of his privacy if his addressee collaborates in the surveillance because: (i) The person knows he is taking the risk that his addressee will make what he says public; (ii) The presence of the electronic transmitter does not constitute an invasion of privacy, it just makes for a more accurate record of the conversation; (iii) As a matter of public policy we do not recognize that a person has any expectation to be free of electronic surveillance if his addressee decides to cooperate with a government agent.
Placed in proper perspective, the majority's reasoning that it has the power to dispense with the warrant safeguard for certain communications because no delegate said anything to the contrary in committee is a flimsy excuse for avoiding the obvious fact that the delegates and the people intended to defend all communications, just as they intended to defend all houses, by making a search or seizure outside the judicial process, without prior approval by a magistrate or a judge, per se unreasonable under article 1 § 5. The failure of any delegate in committee or on the convention floor to make any distinction between the different kinds of searches, seizures or interceptions against which the warrant requirement protects only reaffirms what is already clear from the language of the constitution itselfall communications are protected and no exception was intended. Moreover, the people of this state adopted the constitution by popular vote; the delegates were merely authorized to draft the instrument and submit it to the electorate. Therefore, the function of this court in interpreting the constitution is not so much to determine how it was understood by its framers as how it was understood by the people adopting it, since the constitution derives its force as a fundamental law, not from the action of the convention, but from the people who have adopted it. Debates of a convention are sometimes illuminating, but are not necessarily controlling, and should not be resorted to for the purpose of overruling a plain and unambiguous provision. State ex rel. Brewster v. City of New Orleans, 35 La.Ann. 532 (1883). See generally, 16 Am.Jur.2d Const.Law § 125 at n. 95. The majority opinion breaches all of our time-honored, common sense precepts of constitutional construction by using a committee's silence which actually supports the meaning of a plain and unambiguous provision to judicially overrule it.
Since the interception and seizure of Reeves' communications was conducted outside the judicial process, without prior approval by a judge or magistrate, it was unreasonable per se, and it was unnecessary for the majority to consider whether the intrusion breached any other requirement *425 of article 1 § 5. However, the majority compounded its error by its incorrect and unwarranted assumption that article 1 § 5 merely protects against invasions of privacy. Just as the Fourth Amendment, article 1 § 5 protects individual privacy against government intrusion, but its protections go further, and often have nothing to do with privacy at all. Katz v. United States, 389 U.S. at 350, 88 S.Ct. at 510. "The average man would very likely not have his feelings soothed any more by having his property [or his communication] seized openly than by having it seized privately and by stealth." Griswold v. Connecticut, 381 U.S. 479, 509, 85 S.Ct. 1678, 1695, 14 L.Ed.2d 510 (dissenting opinion of Mr. Justice Black) cited with approval by the Court in Katz, 389 U.S. at 350 n. 4, 88 S.Ct. at 510 n. 4. Thus, in addition to its errors in holding that no warrant is required if a person's addressee collaborates in bugging him and that such intrusion does not invade his privacy, it was further error for the majority to assume that such an interception of a person's communication without probable cause does not constitute an unreasonable search or seizure under the Constitution. By this oversight, the majority has made it possible for electronic bugging to proceed apace, not only without any judicial regulation, but without the necessity for government agents to have probable cause for intrusion, thus freeing the agents of any cause for self-restraint or reason to believe their actions will ever be questioned in a later criminal or civil proceeding.
Aside from the majority opinion's egregious errors in dispensing with the separate protections of probable cause and a warrant before seizure of a person's communication, its offenses against the constitution are aggravated by its evisceration of the guarantee against invasion of privacy. The majority's "reasonable expectation" approach is circular and meaningless, leading it to adopt an untenable policy that a person has no reasonable expectation of security in his communications, which directly conflicts with the constitution's guarantee that every person shall be secure in his communications.
That the reasonable expectation approach is circular and useless in determining whether third party electronic surveillance is an unreasonable seizure was recognized by the foremost exponent of that approach, See Katz v. United States (Harlan, J., concurring), Mr. Justice Harlan, in his dissent in U.S. v. White:
While [the reasonable expectations and assumption of risk approaches] represent an advance over the unsophisticated trespass analysis of the common law, they too have their limitations and can, ultimately, lead to the substitution of words for analysis. The analysis must, in my view, transcend the search for subjective expectations or legal attribution of assumptions of risk. Our expectations, and the risks we assume, are in large part reflections of laws that translate into rules the customs and values of the past and present.
Since it is the task of the law to form and project, as well as mirror and reflect, we should not, as judges, merely recite the expectations and risks without examining the desirability of saddling them upon society. The critical question, therefore, is whether under our system of government, as reflected in the Constitution, we should impose on our citizens the risks of the electronic listener or observer without at least the protection of a warrant requirement.
This question must, in my view, be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement. For those more extensive intrusions that significantly jeopardize the sense of security which is the paramount concern of Fourth Amendment liberties, I am of the view that more than self-restraint by law enforcement officials is required and at the least warrants [401 U.S. 787, 91 S.Ct. 1143] should be necessary. Cf. Terry v. Ohio, supra [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889]; Davis v. Mississippi, supra [394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676]. *426 401 U.S. at 786-87, 91 S.Ct. at 1143 (Harlan, J., dissenting)
That the reasonable expectations approach is meaningless is evident from the majority opinion which reasons in a circle:
A. The test for determining whether a warrantless interception of a person's communication with compliance of his addressee violates the constitution depends on whether he has a reasonable expectation of privacy.
B. However, society cannot allow anyone to have a reasonable expectation that his communications are not being electronically recorded with his addressee's compliance because: (i) Society seeks to foster truth, not to suppress it; (ii) The presence of the transmitter merely makes for an accurate record; (iii) The recordings will exculpate the innocent and convict the guilty; and (iv) That permission of such surveillance will have a chilling effect on speech, associations or traditional notions of privacy is speculative.
C. Therefore, when a government agent electronically monitors a person's communication without his knowledge or consent with the compliance of his addressee it does not constitute an invasion of privacy.
However, as Justice Harlan observed, this is merely a substitution of words for analysis. The idea of "reasonable expectations of privacy" has no objective meaning if this court will not permit anyone to expect freedom from consensual electronic monitoring. In the final analysis, the majority has simply decreed that by law such monitoring of communications is not an invasion of privacy.
The majority's fiat that a Louisianian has no reasonable expectation of freedom from such electronic monitoring is contrary to the constitution in at least two respects. First, the ordinary law abiding person in this state as representative of the people who adopted the constitution does have such an expectation and would definitely consider that his privacy has been invaded by such mischief, even though he is not guilty of a crime. Second, both the federal reasonable expectations approach, Katz (non-consensual monitoring), and the federal assumption of risk approach, White (consensual monitoring) were rejected by the framers and the people in adopting a state constitution which expressly protects "communications" and not just privacy. Both of the federal approaches as employed by the majority depend on the theory that when a person speaks to another he loses his right to privacy as to what he says because he takes the risk that his addressee will make it public. But article 1 § 5 protects more than the privacy guarantee of the Fourth Amendment as envisioned by either the reasonable expectation or the assumption of risk approaches, because the state constitution guarantees that citizens will be secure in their communications. The people of this state struck a different balance than that of the U.S. Supreme Court in Katz and White. Thus, a Louisianian is not merely guaranteed privacy up until he incurs a risk of publication by transmitting information to another. Under our charter the communication itself is protected so that the safeguard does not cease at the beginning of the act of communication but continues throughout the entire act of transmission of the information. Moreover, article 1 § 5 expressly guarantees that the communication itself shall be secure from unreasonable searches and seizures by the government. Thus, there is no justification under article 1 § 5, as the White plurality found under the Fourth Amendment, for holding that this protection of a person's communication from government interception is over before the communication fully comes into being. The plain wording of the state constitution, and the convention history which showed a deep concern over government electronic surveillance, and the lack of any attempt by any delegate to preserve or incorporate federal rules or approaches, convincingly indicate an intention by the delegates and the people to adopt a safeguard for communications which superseded the approach reflected in the federal cases.
*427 The majority's argument that we should imitate a number of states which "have recognized a distinction between consensual and nonconsensual surveillance," is unconvincing. See, footnote 13. Of the states listed, only three have express constitutional provisions relative to the right of privacy. And, only one of the cases from these states construes its constitutional right to privacy to allow warrantless consensual electronic monitoring. See, People v. Richardson, 60 Ill.2d 189, 328 N.W.2d 260, app. dismissed, 423 U.S. 805, 96 S.Ct. 13, 46 L.Ed.2d 25 (1975). However, among states with affirmative constitutional guarantees of the right to privacy or specific protections of communications against unreasonable invasion, the majority rule would appear to be to the contrary. See, e.g. State v. Sarmiento, 397 So.2d 643 (Fla.1981); State v. Glass, 583 P.2d 872 (Alaska 1978); State v. Brackman, 178 Mont. 105, 582 P.2d 1216 (1978). Cf. People v. Beavers, 227 N.W.2d 511, 393 Mich. 554 (1975).

CONCLUSION
The majority opinion is deeply troubling. It reveals a low regard for our people's efforts toward constitutional self-government by imposing Washington's pre-Watergate view of acceptable electronic bugging on Louisianians even though the federal standard was rejected by our voters and delegates.
Like a blindfolded Houdini, the majority opinion writer eludes uncontradicted convention history, wiggles free of plain words in the constitution and discovers a gap in the document no other scholar knew existed, to find, after all, that, whenever this court wishes, private communications can be seized or intercepted without a warrant and without probable cause supported by oath or affirmation. Unfortunately, his virtuosic performance may have cost us much more than he expected. In his escape from the explicit constitutional guarantee that every person "shall be secure in his person, property, communications, houses, papers and effects against unreasonable searches, seizures, or invasions of privacy," he develops a new, paradoxical method of interpretation under which the constitution achieves results which contradict its plain words.
Under the majority's interpretation, words do not mean what they seem. Although the constitution expressly guarantees the security of "communications," it provides no more, and perhaps less, protection than if the word had been left out. Although the term "communications" was placed in the very center of the elements of personal security protected from unreasonable intrusion by the requirement of a warrant and probable cause supported by oath or affirmation, the constitution does not demand either a warrant or probable cause before communications are seized or invaded. Although the delegates said nothing that indicates communications should receive less protection, their silence in debate authorizes this court to dispense with all protections of communications. Even though the constitution's express guarantee against unreasonable invasions of privacy appears to establish an affirmative right to privacy in both criminal and civil areas of law, this court recognizes no reasonable expectation of privacy in communications; instead, this court requires every person to have an expectation in his private conversations that his confidant is a secret government agent who is electronically recording his words.
A comparison of the original committee proposal in the constitutional convention, the final version of article 1 § 5 as adopted by the people, and the majority opinion graphically illustrates what has happened.
Original Proposal
Every person shall be secure in his person, houses, papers, and other possessions against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause, supported by oath or affirmation particularly describing the place to be searched, the person or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a *428 search or seizure conducted in violation of this section shall have standing to raise the illegality of that search or seizure in the appropriate court of law. [No law shall permit the interception or inspection of any private communication or message.]*
Article 1 § 5
Every person shall be secure in his person, property, communications,* houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the person or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
* Brackets indicate the deletion from the original proposal. Italics indicate the addition to the final version.
The committee originally would have given absolute protection to communications. The convention and the people sought to protect communications on an equal footing with a one's person, house, property, papers and effects, thus safeguarding them with the warrant and probable cause requirements. The majority has in effect removed the word communications from article 1 § 5 and written a constitutional law which gives communications less protection than would have been accorded if the convention and the people had never attempted to give more.
NOTES
[*] The Honorables Ned E. Doucet, Jr., of the Court of Appeal, Third Circuit, and Thomas J. Kliebert and Robert J. Klees of the Fourth Circuit, participated in this decision as Associate Justices pro tempore, joined by Chief Justice Dixon and Associate Justices Calogero, Dennis and Watson.
[1] The question is res nova. We have not before considered what type of "communications" and "privacy" are protected by the express guarantees of Article 1, § 5 of the 1974 Louisiana Constitution or the nature of these safeguards. Previous cases involving electronic surveillance have turned on federal legal and constitutional issues. See State v. Hennigan, 404 So.2d 222 (La.1981); State v. Petta, 359 So.2d 143 (La.1978); State v. Glover, 343 So.2d 118 (La.1977) (on original hearing).
[2] Mr. Jenkins

"This is at top of page 15. It's my Section 23. It's very simple. It says, `No law shall permit the interception or inspection of any private communication or message.' And this is aimed directly at eavesdropping, wiretapping and this sort of thing. I hope we never get to the point in this country where the government would look at our mail and listen to our phone conversations and things of this nature. It's just not necessary and this would be a good protection for our people in this regard I think.
* * * * * *
Mr. Jenkins
"Well, I don't know. If you look at some of the congressional investigations, they were Chuck Bursie, Adlai Stevenson, all these people beingthe FBI was listening to them. I mean you know, all sorts of reasons. They like to do these things.
* * * * * *
Mr. Roy
"Well, first of all we're starting out with the proposition that you may not under any circumstances intercept or inspect his private communication or messages.
Mr. Weiss
"Except.
Mr. Roy
"No. There's no exception.
* * * * * *
Mr. Weiss
"What about someone plotting to overthrow the government then you would have no right to interfere with any of his messages.
Mr. Roy
"You see, the federal legislation will apply; this is going to stop our state from doing it. There's no way we can stop the attorney general of the United States. Don't they have the right, for national security reasons, to wire-tap?
* * * * * *
Mr. Roy
"This is just state.
Mr. Vick
"Because the problem, gentlemen and ladies, has I think been made manifest by the news in the past, you know, weak insofar as surveillance and the ... I'm not talking about electronic surveillance only, but, my goodness, for a law and order administration, I mean you know, we've ... we have seen a lot in the past week or so. And I think it commands us to look at our search and seizure article very carefully."
Documents of the Louisiana Constitutional Convention of 1973 Relative to the Administration of Criminal Justice, pp. 851, 852, 865.
[3] Mr. Shieber

"I think that there should be something in our state constitution protecting against unreasonable searches and seizures and I agree entirely with that. It's just that the outright ban on ... in the last sentence is a threat, to, I think to our state and to the people of our state." Documents, supra, p. 905.
[4] Mr. Vick

"I just have a point of information. The way you have it now, it would allow under certain circumstances, and with a court order, wiretapping.
Mr. Guarisco
"Yes, it would.
Mr. Weiss
"Yes, communications...
* * * * * *
Mr. Vick
"It is the politics involved in it, please don't interpret the tenor of the discussion to indicate that we approve of wiretapping, because we do not.
* * * * * *
Mr. Guarisco
"Let me make this comment, that before we adopted `communications' you could do it without a warrant. Now we are at least requiring a warrant to do it. So we have improved upon it." Documents, supra, p. 917.
[5] Documents, supra, p. 854.
[6] Article 1, § 5 of the Hawaii Constitution, as amended in 1968, protects against "invasions of privacy." The Hawaii Supreme Court concluded in State v. Roy, 54 Haw. 513, 510 P.2d 1066 (1973), that the state constitutional guarantee against invasions of privacy was added "out of a concern to protect against extensive governmental use of electronic surveillance techniques, and not out of any desire to curb the activities of secret government agents" or to suppress their testimony to their direct observations. 510 P.2d at 1069.
[7] A majority of the high court apparently accepted this holding without further explanation or analysis in United States v. Caceres, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).
[8] It may be that, as in other search and seizure contexts, the requirement of a warrant may be dispensed with in exigent circumstances. We withhold passing on this issue until presented with a specific case.
[1] La. Const. art. I, § 5:

Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
U.S. Const. amend. IV:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
[2] Since we find in this case that consensual electronic surveillance does not constitute an "invasion of privacy", we do not address the issue of whether the invasion was "unreasonable".
[3] The original proposal read:

Every person shall be secure in his person, houses, papers, and other possessions against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause, supported by oath or affirmation particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this section shall have standing to raise the illegality of that search or seizure in the appropriate court of law. No law shall permit the interception or inspection of any private communication or message.
[4] MR. JENKINS

This is at top of page 15. It's my Section 23. It's very simple. It says, "No law shall permit the interception or inspection of any private communication or message." And this is aimed directly at eavesdropping, wiretapping and this sort of thing. I hope we never get to the point in this country where the government would look at our mail and listen to our phone conversations and things of this nature. It's just not necessary and this would be a good protection for our people in this regard I think.
Documents of the Louisiana Constitutional Convention of 1973 Relative to the Administration of Criminal Justice, p. 851.
[5] MR. LANDRY

Just a point of clarification, Professor Shieber, it is your position then, that you are suggesting in effect that after, say "person" in searches and seizures, we should put "communication" and then delete the last sentence? Is that what you are suggesting?
I would like to clarify your ....
DR. SHIEBER
In where?
MR. LANDRY
After "person", you are suggesting putting "communication?
DR. SHIEBER
No, I am saying you should leave it alone.
MR. LANDRY
No, I am saying in the first sentence, add "communication"?
DR. SHIEBER
No, sir, because communication is something that belongs to a person that is protected against search and seizure as it is in the federal constitution which doesn't specify communications. It just speaks about protecting persons and if you say "every person shall be secure in his person, houses, papers and other possessions", you could put in there, add "communications and other possessions". Oh, I see ... "Shall be secure in his person, houses, papers" ... I see, I thought you meant every person ... I see, I thought you were speaking about the first "person". I wouldn't put anything in, I would stick with the language of the federal constitution on this and because the federal constitution has been interpreted as protecting against illegal searches and seizures of communication without any specification of the word "communication", and I think if this committee and the convention adopt language which is similar to that of the federal constitution, the courts would say that they were going along knowing the federal interpretation, they were going along with the federal interpretation.
MR. STINSON
Why should we put it in ...
MR. GUARISCO
Why make a mistake about it? It won't hurt to put it.
Documents, supra, p. 904-905.
[6] Documents, supra, p. 849-851.
[7] Documents, supra, p. 905-907.
[8] See Documents, supra, p. 917.
[9] MR. LANDRY

Alright. "Every person shall be secure in his person, property, communications, houses, papers and effects against unreasonable searches, seizures or invasions of privacy."
MR. JENKINS
I was going to suggest that we reinstitute that last sentence, on wiretapping. But you know, I don't think we are going to pass it and you know when we put in this word ... this language on communications and invasions of privacy, I think this is going to give us a lot of protection against this sort of thing.
MR. A. JACKSON
Why don't we just leave it like this? They are going to kill us Woody ... I mean I'm not trying to ... Please understand me. We've got to cover ...
MR. JENKINS
I understand ... MR. GUARISCO
... it says CC committee wiretapping. That's the kind of ...
MR. ROY
... the professor made a pretty good argument when he said if you can get a federal, I mean if you can get a ... court order to allow someone to enter your house to try to obtain evidence, ... probable cause, everything being right, to get something that convicts you, how in the world are you-all going to say that you can'tyou shouldn't be allowed to intercept a message from this person to someone on the outside. You can't rationalize it.
MR. JENKINS
Well realistically too, when we put in this language, "invasions of privacy", given our new supreme court in this state, I think the courts are going to take care of things real well. I really do.
Documents, supra, p. 917.
[10] Cooley on Torts 2d ed. p. 29 (1888); Warren and Brandeis, "The Right to Privacy," 4 Harv. L.Rev. 193, 205 (1890).
[11] Ruebhausen and Brim, "Privacy and Behavioral Research," 65 Colum.L.Rev. 1184, 189 (1965); Skils, Social Inquiry and the Autonomy of the Individual in the Human Meaning of Social Sciences, 114 (Lerner ed. 1959).
[12] Stone, "The Scope of the Fourth Amendment: Privacy and the Police Use of Spies, Secret Agents, and Informers," 1976 Am. Bar Foundation Res.J. 1195, 1207.
[13] The majority of the states have recognized a distinction between consensual and nonconsensual surveillance: State v. Stanley, 123 Ariz. 95, 597 P.2d 998 (1979); Kerr v. State, 256 Ark. 738, 512 S.W.2d 13 (1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975); People v. Velasquez, 641 P.2d 943 (Colo. 1982); State v. Delmonaco, 165 Conn. 163, 328 A.2d 672 (1973); State v. Birge, 240 Ga. 501, 241 S.E.2d 213 cert. denied, 436 U.S. 945, 98 S.Ct. 2847, 56 L.Ed.2d 786 (1978); People v. Richardson, 60 Ill.2d 189, 328 N.E. 260, app. dismissed, 423 U.S. 805, 96 S.Ct. 13, 46 L.Ed.2d 25 (1975); McCarty v. State, 167 Ind.App. 396, 338 N.E.2d 738 (1975); State v. Johnson, 229 Kan. 42, 621 P.2d 992 (1981); Carrier v. Commonwealth, 607 S.W.2d 115 (Ky.App.1980); Smith v. State, 283 Md. 156, 389 A.2d 858 (1978), affirmed, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); Commonwealth v. Thorpe, ___ Mass. ___, 424 N.E.2d 250 (1981); State v. Bellfield, 275 N.W.2d 577 (Minn.1978); Everett v. State, 248 So.2d 439 (Miss. 1971); State v. Anepete, 145 N.J.Super. 22, 366 A.2d 996 (1976); State v. Detter, 298 N.C. 604, 260 S.E.2d 567 (1979); State v. Geraldo, 68 Ohio St.2d 120, 429 N.E.2d 141 (1981); Escobedo v. State, 545 P.2d 210 (Okl.Cr.1976); Commonwealth v. Donnelly, 233 Pa.Super. 396, 336 A.2d 632 (1975), cert. denied, 424 U.S. 974, 96 S.Ct. 1477, 47 L.Ed.2d 744 (1976); Thrush v. State, 515 S.W.2d 122 (Tex.Cr.App.1974); Cogdill v. Commonwealth, 219 Va. 272, 247 S.E.2d 392 (1978); Blackburn v. State, 290 S.E.2d 22 (W.Va.1982).
[14] Even in our initial review of this case, we stated: "Furthermore, the failure to obtain a warrant would not prevent the informant from testifying to what he heard and observed in his conversations with the defendant."
[15] Comment, "Warrantless Use of Electronically Equipped Informers," 85 Harv.L.Rev. 250, 256-257 (1971).
[16] As to the future effect of consensual electronic surveillance, again, we could only speculate.
[1] Compare, for example, the Court's analysis in United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). In determining whether the Fourth Amendment prohibited warrantless arrests in public places in the absence of exigent circumstances, the Court discussed early Congressional approval of warrantless felony arrests by federal marshals.
[2] See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).
[3] This decision should be read in the context of the factual setting in which it arose. The electronic eavesdropping in this case was employed in the course of a legitimate inquiry into allegations of criminal activity, made by a person (Pilley) purporting to have firsthand knowledge of the conspiratorial activities of defendant (and others). The conversation, which was electronically overheard and recorded, transpired in a public warehouse, owned by the state agency which employed both participants in the conversation. Furthermore, the crime committed by defendant (perjury) occurred after the contested police "consensual surveillance". See the argument by the government in United States v. Ceccolini, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). Under these circumstances, I have no difficulty concluding that there was no "unreasonable ... invasion of [the] privacy" of defendant's "communications" which would require that evidence of the recorded conversation could not be used to prove that defendant subsequently lied under oath to a grand jury properly investigating allegations of his official misconduct.
[1] "MR. VICK

I just have a point of information. The way you have it now, it would allow under certain circumstances, and with a court order, wiretapping.
MR. GUARISCO
Yes, it would.
MR. WEISS
Yes, communications ...
MR. A. JACKSON
You have all agreed that ...
MR. JENKINS
Now the reason ... we don't approve of that at all, but we know that if we include that last sentence, we don't have a chance to pass it. Whereas with the language we have we think we can give almost as much protection and we can have a pretty good shot of it passing.
MR. A. JACKSON
We would like to outlaw it but we've got...
MR. VICK
I will accede to your political judgment since you seem to be in harmony with the goals of our cause.
MR. A. JACKSON
Their argument is that ...
MR. VICK
It is the politics involved in it, please don't interpret the tenor of the discussion to indicate that we approve of wiretapping, because we do not.
MR. WEISS
But your sound political judgment is that, Mr. Jenkins, you included that last sentence which we like, that it would just do down without any question ...
MR. JENKINS
That was my sentence, I wrote it, by the way.
MR. WEISS
I know it and your perception is that there would be no hope ...
MR. A. JACKSON
Mine too ...
MR. JENKINS
Thank you.
MR. A. JACKSON
I think we've got so much good stuff in here, I ...
MR. JENKINS
It's just loaded with goodies the way it is.
You can't believe it ...
MR. STINSON
Do you think ...
MR. A. JACKSON
No, sir.
....
I concur with the committee and speaking for all of us who endorsed it, which is ...
MR. GUARISCO
Let me make this comment, that before we adopted `communications' you could do it without a warrant. Now we are at least requiring a warrant to do it. So we have improved upon it."
Documents of the Louisiana Constitutional Convention of 1973: Relative to the Administration of Criminal Justice, June 14, 1973, at 917.
[*] Justice Blanche's opinion appears to have garnered four votes since Justice Lemmon "subscribes to the opinion and assigns additional reasons".