# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 15-1167

**STATE OF LOUISIANA**

**VERSUS**

**MITCHELL A. FLEMMING, JR.**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 144515.1
HONORABLE DAVID M. SMITH, PRESIDING JUDGE

**********

**JOHN D. SAUNDERS**
**JUDGE**

**********

Court composed of John D. Saunders, Billy Howard Ezell, and James T. Genovese, Judges.

**CONVICTION AND SENTENCE AFFIRMED.**
**MOTION TO WITHDRAW GRANTED.**
**REMANDED WITH INSTRUCTIONS.**

**Keith A. Stutes**
**District Attorney-Fifteenth Judicial District**
**Alan P. Haney**
**Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**Edward J. Marquet**
**Louisiana Appellate Project**
**P. O. Box 53733**
**Lafayette, LA  70505-3733**
**(337) 237-6841**
**COUNSEL FOR APPELLANT:**
        **Mitchell A. Flemming, Jr.**

**SAUNDERS, Judge.**

The State charged Defendant, Mitchell A. Flemming, Jr., and co-defendant, Demetrice D. Culbreth, by grand jury indictment with three counts of aggravated rape of K.B.[1], in violation of La.R.S. 14:42. Additionally, the State charged both by grand jury indictment with three counts of armed robbery with a dangerous weapon of K.B., Sebastian Hebert, and Paul Krato, in violation of La.R.S. 14:64.

Defendant entered a written plea of not guilty. The case proceeded to trial, and a jury of twelve found Defendant guilty as to each count on May 14, 2015. On September 24, 2015, the trial court sentenced Defendant to life in prison at hard labor without benefit of probation, parole, or suspension of sentence on each of the three aggravated rape counts, to run concurrently with each other. On each count of armed robbery, the trial court imposed sentences of fifty years at hard labor with credit for time served, to be served concurrently to each other and to Defendant's life sentences.

On January 21, 2016, Defendant's appellate counsel filed a brief and motion in this court to withdraw pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967), and *State v. Jyles*, 96-2669 (La. 12/12/97), 704 So.2d 241, based on counsel's assessment that no non-frivolous issues in the record warrant appeal. The State filed a response brief agreeing with appellate counsel's conclusions on February 10, 2016.

**FACTS:**

On June 17, 2013, K.B. went to Lafayette to visit her friend, Sebastian Hebert, arriving at his apartment around eleven thirty or midnight. After parking her vehicle, she noticed two men, one of whom came up behind her with a gun.

---

[1] Given the nature of Defendant's convictions, the victim's initials are used in lieu of her full name pursuant to La.R.S. 46:1844(W).

She described him as tall with not much hair and a dark complexion, and the State referred to him as "suspect number one." He searched her pockets and purse, taking her cell phone, a dollar, and her keys. The second suspect also had a gun, but his face was covered with a bandana. K.B. described his complexion as "[i]n the middle" of dark and light. Her friend, Sebastian, arrived soon after, and he too had his cell phone taken by the armed men. Both men proceeded to pull off her clothing, and the first man to approach her forced her to perform oral sex on him while placing the gun on her neck. After, the two men "tried to make [K.B.] and Sebastian have sex," but Sebastian's pants were eventually pulled down, and K.B. was forced to perform oral sex on him. Another man walked up during the incident, and he was forced to the ground by suspect number one and robbed. The second suspect then forced K.B. to perform oral sex on him. Eventually, the suspects left and K.B. called the police. At trial, K.B. identified the second suspect as the Defendant, Mitchell Flemming, Jr..

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court errors patent on the face of the record. After reviewing the record, we find one error patent, and correction of the sentencing minutes is required.

Defendant's sentences for armed robbery were not imposed at hard labor as required by La.R.S. 14:64. Although the court minutes indicate these sentences were imposed at hard labor, the sentencing transcript does not. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. As such, the court minutes of sentencing require correction. Each sentence for armed robbery was imposed without the benefit of parole, probation, or suspension of sentence; however, this is not reflected in the

2

court minutes. Accordingly, the trial court is ordered to amend the court minutes of sentencing to accurately reflect that the sentences for armed robbery were imposed without the benefit of parole, probation, or suspension of sentence.

## *ANDERS* ANALYSIS:

In *State v. Benjamin*, 573 So.2d 528, 531 (La.App. 4 Cir. 1990), the fourth circuit explained the analysis based on *Anders*:

> When appointed counsel has filed a brief indicating that no non-frivolous issues and no ruling arguably supporting an appeal were found after a conscientious review of the record, *Anders* requires that counsel move to withdraw. This motion will not be acted on until this court performs a thorough independent review of the record after providing the appellant an opportunity to file a brief in his or her own behalf. This court's review of the record will consist of (1) a review of the bill of information or indictment to insure the defendant was properly charged; (2) a review of all minute entries to insure the defendant was present at all crucial stages of the proceedings, the jury composition and verdict were correct and the sentence is legal; (3) a review of all pleadings in the record; (4) a review of the jury sheets; and (5) a review of all transcripts to determine if any ruling provides an arguable basis for appeal. Under C.Cr.P. art. 914.1(D) this Court will order that the appeal record be supplemented with pleadings, minute entries and transcripts when the record filed in this Court is not sufficient to perform this review.

All error patent reviews include review the record for proper charging, defendant's presence at all crucial stages of the proceedings, the jury composition, the verdict, the sentence, and the jury sheets. A review of the pleadings reveals nothing that would provide a basis for appeal. Therefore, we turn to the transcript to determine if any ruling provides a basis for appeal.

While it is not necessary for Defendant's counsel to "catalog tediously every meritless objection made at trial or by way of pre-trial motions with a labored explanation of why the objections all lack merit[,]" counsel's *Anders* brief must "'assure the court that the indigent defendant's constitutional rights have not been violated.'" *State v. Jyles*, 96-2669, p. 2 (La. 12/12/97), 704 So.2d 241, 241 (citing *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308 (1983) and quoting *McCoy v. Court*

3

*of Appeals of Wisconsin*, 486 U.S. 429, 442, 108 S.Ct. 1895, 1903 (1988)). Counsel must fully discuss and analyze the trial record and consider "whether any ruling made by the trial court, subject to the contemporaneous objection rule, had a significant, adverse impact on shaping the evidence presented to the jury for its consideration." *Jyles*, 704 So.2d at 241 (citing *United States v. Pippen*, 115 F.3d 422 (7th Cir. 1997)). Thus, counsel's *Anders* brief must review the procedural history and the evidence presented at trial and provide "a detailed and reviewable assessment for both the defendant and the appellate court of whether the appeal is worth pursuing in the first place." *State v. Mouton*, 95-981, p. 2 (La. 4/28/95), 653 So.2d 1176, 1177.

Pursuant to *Anders* and *Jyles*, Defendant's appellate counsel filed a brief considering potential issues for appeal. Counsel noted in the factual portion of the brief that the trial court denied trial counsel's motion to suppress statements made by Defendant while in custody. As for the argument portion of the brief, counsel first observed "there are no rulings of the trial court to be challenged" since trial counsel "made no evidentiary objections regarding the introduction of documentary and physical evidence" including DNA evidence.[2] Counsel further noted trial counsel's failure to challenge the reliability or suggestiveness of the photographic line-up.

Next, counsel submitted that the victim identified Defendant several times, noting that she claimed to have been "'100%' sure of his identification." A second victim identified Defendant as well, and a co-defendant corroborated the victims' statements. Lastly, counsel noted evidence analyzed by the Acadiana Crime Lab

---

[2]The authorities recovered DNA evidence from beer bottles located nearby to where the offenses occurred. It does not refer to any DNA collected as a result of a medical examination of the victim.

"identified Mitchell A. Flemming, Jr. and Demetrice D. Culbreth as the likely source of DNA."

Counsel concluded the record contained no non-frivolous issues to offer Defendant relief. Accordingly, counsel seeks to withdraw.

Pursuant to *Anders* and *Benjamin*, we have performed a thorough review of the record in an effort to confirm or reject the conclusions of counsel. Our review of the record revealed two rulings which do not entitle Defendant to any relief but which deserve some discussion.

First, prior to trial, Defendant sought to suppress video-recorded statements made by him while in custody. Specifically, Defendant challenged the admissibility of spontaneous, and arguably inculpatory, statements made by him in the interrogation room but outside the presence of any law enforcement official. The State called Detective Trenton Langwell, who interviewed Defendant in an audio- and video-equipped room at the Detective's Division at the police department. He testified that "we went through the Advice of Rights of the Miranda [sic] and I had him [Defendant] complete a final form stating that he understands [sic] his rights and wished to proceed with the questioning and make a statement." Defendant indicated his understanding and signed the form, which was depicted in the recording. The detective asked Defendant questions and eventually left the room. He returned later for further questioning but left the recording on as he stepped out of the room. While Defendant sat alone in the interrogation room, he began talking to himself:

> He was praying to God and Jesus asking them for forgiveness for what he'd done wrong. He was sorry that this happened. He just wanted a second chance. He wanted to go home. If God would help him out of this situation and forgive him for this situation, he would start doing things the right way and get him a chance [sic], he would stop taking things from people. He would get rid of a gun that he

5

owned[,] and he was basically asking for forgiveness for the situation and the incident he was involved in.

The State proceeded to introduce Defendant's *Miranda* form into evidence without objection from defense counsel. On cross-examination, the detective acknowledged that Defendant had no knowledge that the police would be recording the conversation. In responding to counsel's challenge to the voluntariness of the statements, the detective stated "[t]here is no expectation of privacy in the Police Department[.]" The detective explained that the department policy was to leave the recording on for the safety of the interviewee and officials. On redirect, the State highlighted that portion of the *Miranda* warnings informing Defendant that "[a]nything you say can be used against you in court." The court denied the motion to suppress, finding the statements to have been freely and voluntarily made and not the result of any "influence," fear, intimidation, "direct inducements," or promises. Additionally, the court ruled there is no expectation of privacy in a police interview room. Counsel objected for the record. The video was ultimately introduced at trial and published to the jury.

> In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court
>
>> promulgated a set of safeguards to protect the there-delineated constitutional rights of persons subject to custodial police interrogation. In sum, the Court held in that case that unless law enforcement officers give certain specified warnings before questioning a person in custody, and follow certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot over his objection be admitted in evidence against him as a defendant at trial, even though the statement may in fact be wholly voluntary.

*State v. Leger*, 05-11, pp. 12-13 (La. 7/10/06), 936 So.2d 108, 124, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (footnote omitted) (quoting *Michigan v. Mosley*, 423 U.S. 96, 99-100, 96 S.Ct. 321, 324-25 (1975)). It is arguable that

6

*Miranda* does not even apply to this particular factual scenario since Defendant was not subject to "express questioning" or its "functional equivalent":

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-02, 100 S.Ct. 1682, 1689-90 (1980)(footnote omitted). The first circuit court of appeal addressed a similar issue as that presented here in *State v. Williams*, 10-1392, pp. 3-4 (La.App. 1 Cir. 2/11/11) (unpublished opinion),[3] *writ denied*, 11-1028 (La. 3/9/12), 84 So.3d 542 (alteration in original):

> In the instant case, prior to trial, the defendant moved to suppress his confession/incriminating statement, arguing, *inter alia,* it was not given freely and voluntarily. Following a hearing, the trial court denied the motion, finding, even assuming arguendo, the defendant did not know that he was "being taped," he had no reasonable expectation of privacy while under interrogation for a murder in the interrogation room of the police department.

> Covington Police Department Detective Steven Short testified at the hearing on the motion to suppress. He identified State Exhibit # 1 as a copy of the advice of Miranda rights/waiver of rights form which the defendant signed in his presence. Detective Short indicated he made no promises to the defendant in exchange for his statement and did not intimidate, threaten, or coerce him into making a statement. He conceded he never told the defendant his statement was

---

[3]2011 WL 2178767.

being recorded even when the detective was not in the room, but indicated the recorder was on the desk between the defendant and himself.

The determination of whether a person has a constitutionally protected reasonable expectation of privacy depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). The individual claiming protection must show that he exhibited a subjective expectation of privacy and that his subjective expectation of privacy is one that society is prepared to recognize as reasonable. *Id.*

In denying the motion to suppress, the trial court relied upon *State v. Hussey,* 469 So.2d 346 (La.App. 2 Cir.), *writs denied,* 475 So.2d 777 (La.1985). Hussey involved the issue of the admissibility of an inculpatory conversation in the rear seat of a State Police car, recorded by a hidden recorder. *Hussey,* 469 So.2d at 347. The court in Hussey held the conversation admissible, noting La. Const art. I, § 5 protects against unreasonable invasions of privacy, as does the Fourth Amendment, and that any expectation of privacy the defendants had was unreasonable and unjustifiable under federal jurisprudence. *Hussey,* 469 So.2d at 351; *see State v. Peterson,* 619 So.2d 786, 789 (La.App. 4 Cir.1993)("Thus, if the private individuals talking among themselves in Hussey could not have a reasonable expectation of privacy, an arrestee speaking to police officers in a police annex building would be even less reasonable in having an expectation of privacy."); *Lanza v. State of New York,* 370 U.S. 139, 143, 82 S .Ct. 1218, 1221, 8 L.Ed.2d 384 (1962) ("[I]t is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day."); *United States v. Harrelson,* 754 F.2d 1153, 1168–71 (5th Cir.), *cert. denied,* 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 and 474 U.S. 1034, 106 S .Ct 599, 88 L.Ed.2d 578 (1985) (electronically intercepted conversation between an incarcerated prisoner and his visiting wife by a hidden and disguised tape recorder was admissible because the expectation of privacy could not be found reasonable).

There was no error or abuse of discretion in the trial court's denial of the motion to suppress. The defendant attempts to distinguish *Hussey*, arguing he had not been arrested and charged with a crime when he made his incriminating statement and he was alone in a room, muttering to himself. These distinctions, however, are inconsequential. While the defendant had not been formally arrested when he made the statement at issue, he certainly knew he was suspected of a crime, and had been formally advised of, and waived his Miranda rights. Additionally, the room in which the defendant was alone, was the interrogation room of a police department. Further, this case does not involve a hidden recorder, but rather a recorder on a

desk in front of the defendant. Any expectation of privacy the defendant had under these circumstances was not reasonable.

The foregoing jurisprudence suggests Defendant's spontaneous comments were not subject to *Miranda*, and therefore any failure of law enforcement to notify Defendant that he was being recorded—a requirement not imposed by the *Miranda* ruling—is irrelevant. Furthermore, Defendant cannot invoke any "expectation of privacy" in the interrogation room, as explained by the first circuit in *Williams*. To the extent there is any doubt as a result of the "hidden recorder" language in *Williams*, we find that an objective analysis of the expectation of privacy controls:

> In this assignment of error, defendant complains that the trial court erred in denying his motion to suppress his inculpatory statement because his constitutional right to privacy was violated by the covert taping of the statement and because the police officers believed the taping to be illegal when they did it. What defendant appears to be arguing is that he had an expectation of privacy in making the statement to the police which was violated by the bad faith of the officers when they secretly recorded his statement.

> With regard to the violation of defendant's right to privacy under Article I, Sec. 5 of the Louisiana Constitution, defendant could not have had a reasonable expectation of privacy in making an inculpatory statement to the police officers who had just arrested him. In *State v. Hussey,* 469 So.2d 346 (La.App. 2d Cir.1985), *writ denied* 475 So.2d 777 (La.1985), a state trooper secretly recorded the conversation between the defendants who were seated in the trooper's car where they discussed the burglary they had committed. The Second Circuit concluded that under the circumstances the defendants' expectation of privacy would not have been reasonable or justifiable. Thus, if the private individuals talking among themselves in *Hussey* could not have a reasonable expectation of privacy, an arrestee speaking to police officers in a police annex building would be even less reasonable in having an expectation of privacy. See also *State v. Reeves,* 427 So.2d 403 (La.1982).

*State v. Peterson*, 619 So.2d 786, 789 (La.App. 4 Cir. 1993). Furthermore, to the extent there is any concern that the statement involved Defendant's prayers, "appeals to a defendant's emotions and/or religious beliefs typically do not render an ensuing confession involuntary." *State v. Blank*, 04-204, p. 16 (La. 4/11/07), 955 So.2d 90, 108, *cert. denied*, 552 U.S. 994, 128 S.Ct. 494 (2007). In turn,

9

Defendant's invocation of his faith in an area wherein the expectation of privacy is not recognized cannot provide a basis for suppression.

Based on the foregoing jurisprudence, we find no abuse of discretion by the trial court when it ruled that Defendant had no expectation of privacy while sitting in an interrogation room at the police station after his arrest.

The second objection worth discussion occurred during K.B.'s testimony, during which the State questioned K.B. regarding her non-identification of other suspects presented to her in various photo arrays. Defense counsel objected that those other arrays were irrelevant and "unduly prejudicial," as the victim had just testified to having identified Defendant and co-defendant in previously discussed arrays. The State countered that the additional photo arrays were relevant to the victim's credibility, as she identified only Defendant out of the various arrays shown. The court denied the objections.

Most often the issue surrounding photo array testimony concerns the suggestiveness of the array. Here, the argument is not suggestiveness but the State's effort to bolster the credibility of its main witness by contrasting her identification of Defendant with her non-identification of other suspects.

"The jury's function is to assess the credibility of the witnesses, and it is proper for both sides to argue that their witnesses should be believed and the other side's not believed." *State v. Jones*, 49,948, pp. 9-10 (La.App. 2 Cir. 9/30/15), 178 So.3d 1075, 1081 (citing *State v. Jason,* 99-2551 (La.App. 4 Cir. 12/6/00), 779 So.2d 865, *writ denied,* 01-37 (La. 11/9/01), 801 So.2d 357). Here, the State submitted that the evidence was relevant to help the jury determine whether to believe K.B.'s identification of Defendant. The jurisprudence on this issue is summarized as follows:

> In *Manson* [*v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243 (1977)] the Supreme Court set forth a five-factor test to determine whether an identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation.

*State v. Brown*, 98-510, p. 6 (La.App. 4 Cir. 7/14/99), 744 So.2d 93, 97. Of concern here is the fourth prong of the *Manson* analysis, the certainty of K.B.'s identification of Defendant. The State would presumably argue that K.B.'s non-identification of other potential suspects, and her exclusive identification of Defendant (and co-defendant Culbreth), warranted the introduction of what defense counsel described as "irrelevant" and "unduly prejudicial" arrays.

The question, then, is whether the State impermissibly bolstered the identification testimony of K.B. with this tactic. We find that the State did not.

Generally, the State is permitted to elicit "testimony of a prior identification to support the present in-court identification." *State v. McCarter*, 577 So.2d 816, 817 (La.App. 2 Cir. 1991). The first circuit has relied on evidence similar to that here in evaluating the reliability of identifications:

> The State further asserted that the accuracy of Verret's identification was also bolstered by the fact that he had an opportunity to view three individuals caught with his iPod after the robbery, but did not identify any of them as either of the robbers. . . .
>
> . . . .
>
> Further, the identification by Verret was reliable. Verret viewed the top of the first robber's face in good lighting with a very high degree of attention. His description of the robber was accurate, he had a very high degree of certainty, and only a few hours passed between the crime and the confrontation.

*State v. Johnson*, 08-2352, p. 7 (La.App. 1 Cir. 5/8/09) (unpublished opinion).[4] In *Johnson*, while the State advanced the argument that the witness's non-

---

[4] 2009 WL 1272309.

identification bolstered his identification, the court took no issue with the introduction of such evidence and appeared to have relied on such evidence, in part, in finding the identification of the defendant reliable. The fourth circuit relied on such evidence in the context of multiple photo arrays:

> Based upon these sightings, LaVergne compiled two photographic line-ups, one of which included [defendant's] photograph. Abadie testified he showed the line-ups to Cannon approximately a month after the sales, and Cannon positively identified [defendant] as the seller. Cannon was unable to identify anyone in the other line-up.
>
> . . . .
>
> Even assuming arguendo that the line-up was suggestive, we do not find the identification unreliable under the *Manson* factors. Agent Cannon was conducting an undercover narcotics transaction. He testified regarding his training in this field, and about this particular transaction. He stated he saw defendant clearly for seven to ten minutes and was careful to note her features because he assumed he would have to identify her again. He gave Agents Abadie and LaVergne a very detailed description of the defendant's physical appearance and clothing immediately after the second purchase. From this description, and upon viewing the scene, Agent LaVergne was able to immediately recognize defendant. Even though he reported her hair as red, defendant admitted that she has several different colored hair pieces. Also, upon viewing the line-up, Agent Cannon identified defendant immediately and positively. Lastly, ***Agent Cannon's inability to identify anyone from the second male line-up bolsters the reliability of his selection of defendant; he did not identify anyone because he was not certain***. Thus, under the totality of the circumstances, Agent Cannon's pretrial identification of defendant was reliable and admissible.

*State v. Brown*, 744 So.2d at 96-99 (emphasis added).

Based on the foregoing jurisprudence, we find no error by the trial court in allowing the State to question K.B. regarding her non-identification of other suspects. Harmless error analysis would apply here, as both a second victim and co-defendant Culbreth identified Defendant in court as well. *See State v. Anderson*, 11-106 (La.App. 3 Cir. 6/1/11), 66 So.3d 568, *writ denied*, 11-1493 (La. 9/23/11), 69 So.3d 1167.

**DECREE:**

Our review of the record reveals no issues that would support an assignment of error on appeal. Therefore, Defendant's conviction and sentence are affirmed, and Defendant's appellate counsel's motion to withdraw is granted.

However, the trial court is ordered to amend the court minutes of sentencing to accurately reflect that the sentences for armed robbery were imposed without the benefit of parole, probation, or suspension of sentence.

**CONVICTION AND SENTENCE AFFIRMED. MOTION TO WITHDRAW GRANTED. REMANDED WITH INSTRUCTIONS.**